A. Barry Cappello (SBN 037835)
abc@cappellonoel.com
Leila J. Noël (SBN 114307)
lnoel@cappellonoel.com
Lawrence J. Conlan (SBN 221350)
lconlan@cappellonoel.com
CAPPELLO & NOËL LLP
831 State Street
Santa Barbara, California 93101
Telephone:    (805) 564-2444
Facsimile:    (805) 965-5950

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDRA B. GEREMIA, as Trustee for the Alexandra Geremia Family Trust dated 8/5/1998, individually and on behalf of others similarly situated,<br><br>                   Plaintiff,<br><br>vs.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P., a Delaware limited partnership, PLAINS PIPELINE, L.P., a Texas limited partnership,<br><br>                   Defendants. | Case No.:<br><br>COMPLAINT – CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

# I. INTRODUCTION

Plaintiff Alexandra B. Geremia, as Trustee for the Alexandra Geremia Family Trust dated 8/5/1998 ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following against Plains All American Pipeline, L.P., and Plains Pipeline, L.P. ("Defendants" or "Plains"), based where applicable on personal knowledge, information and belief, and the investigation and research of counsel.

# II. NATURE OF THE ACTION

1.      On May 19, 2015, a 24-inch oil pipeline running along the coast near Santa Barbara, California ruptured and thousands of gallons of crude oil began pouring out, ultimately making its way into the Pacific Ocean.  The pipeline, known as Line 901, is owned and operated by Defendants, Texas-based companies, for whom ruptured pipelines are nothing new.   In 2014 a Plains pipeline ruptured in Los Angeles' Atwater Village, sending more than 18,000 gallons of crude running through the city's streets.  Toxic fumes were reported in the industrial area for days after the spill. Since 2006, federal agencies have cited them for at least 175 safety and maintenance violations. Plains Pipeline has reported 179 such incidents since 2006.  Among more than 1,700 operators included in a database maintained by the Pipeline and Hazardous Materials Safety Administration, only four reported more incidents than Plains.  Plains has been cited for oil spills across the country fined millions of dollars.

2.      The failure of Line 901 is alarming because the pipeline runs near the edge of the Pacific Ocean, and the rupture caused tens of thousands of gallons of toxic crude oil to flow unabated over some of the most beautiful beaches and pristine waters along California's Gaviota Coast.

3.      Oil invaded nearly beachfront properties, covering them with toxic crude, coating the shoreline, and clinging to rocks, sand, and the animals it touched.  By the time Defendants managed to shut off Line 901, it had discharged over 100,000 gallons of crude oil.  Noxious odor of crude oil has permeated the air, drenched wildlife with oil, and left miles of previously pristine shoreline covered in thick black tar.  Several public beaches have closed since the spill, and more than 100 birds and dozens of mammals, including sea lions and dolphins, have died from contact with the oil.

CAPPELLO
& NOËL LLP
TRIAL LAWYERS

09000.024 - 245828.2

Oil floated out to sea, creating a slick that stretched for miles, contaminating several State Marine Conservation Areas along the way, forcing beaches to close and requiring clean up across nearly 100 miles of shoreline along California's Central Coast.

4.      The beachfront properties along the Central Coast if California, like coastal properties throughout the state, are highly valuable.  The property owners enjoy the unspoiled sand and water, direct access to fishing, surfing, kayaking and other activities.  The waters and breaches are home to hundreds of sensitive animal species, and serve as the backbone of the local economy.  All that has been damaged by Defendants' oil spill, and that damage will likely last for decades.

5.      This tragedy could have been averted had Defendants installed an automatic shut-off valve on the pipeline. Such mechanisms are common on pipelines across the country.  Line 901 appears to be the only pipeline of its kind in Santa Barbara County without this key safety feature.

6.      The decision to operate without an automatic shut-off system is no accident.  When Defendants, through their predecessor in interest, built the pipeline in 1987, Santa Barbara County demanded that a shut-off system be installed and that the County be allowed to inspect the welds on the pipeline.  Shirking their responsibility, Defendants sued, arguing that the County lacked the authority to force them to install an automatic shut-off system or inspect its pipeline, basic safety systems and protocols that almost all the other pipeline owners in the area had installed.  As a result, Line 901 has no automatic shut-off system, and when the pipeline failed, more than 100,000 gallons of crude oil poured out and polluted the precious waters and beaches along the coast.

7.      Recent investigation of inspection results from the last five years revealed systemic and extensive corrosion throughout the length of Defendants' pipeline.  An in-line inspection just weeks before the spill showed disturbing levels of corrosion on both Line 901 — the pipeline that ruptured — as well as Line 903, an adjoining pipeline also operated by Plains on the Central Coast. Third-party metallurgists on site estimated the metal loss at the rupture site left only 1/16 of an inch of pipe between pressurized crude oil and the environmentally sensitive coastline which the pipeline runs. Federal inspectors from the Pipeline and Hazardous Materials Safety Administration (PHMSA) also found three corrosion repairs near the rupture site made after a 2012 in-line inspection, and the

1  May 5, 2015, inspection found three other areas of "extensive corrosion" on Line 901 requiring

2  "immediate investigation and remediation."

3        8.     Plaintiff Alexandra B. Geremia, as Trustee for the Alexandra Geremia Family Trust

4  dated 8/5/1998 brings this action pursuant to Federal Rule of Civil Procedure 23 on her own behalf

5  and as a representative of others similarly situated to recover significant injuries and economic losses

6  they have incurred and will continue to incur because of Defendants' oil spill.

7  **III. PARTIES**

8        9.     Plaintiff Alexandra B. Geremia, as Trustee for the Alexandra Geremia Family Trust

9  dated 8/5/1998, is a resident of Santa Barbara County, California, citizen of California, and an owner

10  of oceanfront real property north of Refugio State Beach.  The crude oil that Defendants spilled into

11  the Pacific Ocean encroached directly onto Ms. Geremia's property, as it did onto other properties

12  up and down the California coast.

13        10.     Defendant Plains All American Pipeline, L.P. is a Delaware limited partnership with

14  its principal place of business in Houston, Texas.  On information and belief, Defendant operates

15  through or on behalf of PAA GP LLC, a Delaware limited liability company, Plains AAP, L.P.

16  ("AAP"), a Delaware limited partnership that is the sole member of PAA GP LLC, Plains All

17  American GP LLC ("GP LLC"), a Delaware limited liability company, Plains GP Holdings, L.P.

18  ("PAGP"), a Delaware limited partnership that is the sole member of GP LLC, and PAA GP

19  Holdings LLC, the general partner of PAGP.

20        11.     Defendant Plains Pipeline, L.P. is a Texas limited partnership with its principal place

21  of business in Houston, Texas. Plains Pipeline, L.P. is a subsidiary of Plains All American Pipeline,

22  L.P.

23        12.     Defendants own and operate the All American pipeline system, a common carrier

24  crude oil pipeline system that transports crude oil produced from two outer continental shelf fields

25  off the California coast via connecting pipelines to refinery markets in California.  The system

26  receives crude oil from ExxonMobil's Santa Ynez field at Las Flores and receives crude oil from the

27  Freeport-McMoRan-operated Point Arguello field at Gaviota.

28

3
COMPLAINT – CLASS ACTION

09000.024 - 245828.2

# IV. JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and members of the proposed class are citizens of different states than Defendants.

14.     This Court has personal jurisdiction over Defendants because they are registered to conduct business in California, and have sufficient minimum contacts with California.

15.     Jurisdiction is also appropriate under 28 U.S.C. § 1331 because the claims asserted by Plaintiff arise under the laws of the United States of America.

16.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

# V. FACTS

**A.     California's Central Coast**

17.     The Central Coast of California, which includes the Gaviota Coast north of Santa Barbara, is a special place where beachfront properties enjoy direct access to blue waters and magnificent coastline, and residents walk the beaches, fish from the shores, swim, surf, kayak and use and enjoy their properties.

18.     Because of the natural beauty and the bounty offered by the ocean, beachfront properties along the coast are highly sought after, and their value is reflected in the direct access of the homes to the sandy beaches, fishing, water sports, and clean, fresh air.

19.     Sadly, Defendants' oil spill has now contaminated the coast, undermined the health of the environment, and negatively impacted the value of properties along the shore.

20.     In 1969, a blowout at Union Oil's Platform A offshore drill rig sent millions of gallons of oil into the waters and onto the beaches of Santa Barbara County.  The blowout killed thousands of birds, dolphins, fish, and other marine life, but it effectively led to the birth of the environmental movement, and caused governments and some companies to take significant steps to make the production and transportation of crude safer and more reliable.  Defendants, on the other hand, are notable for their track record of doing otherwise, astonishing for an enterprise with a collective market value of $18.8 billion and roughly 18,000 miles of pipeline in North America.

**B.     The Failure of Defendants' Line 901**

21.     Line 901 is a 10-mile long, 24-inch wide pipeline owned and operated by Defendants, which runs near the edge of the Pacific Ocean and transports up to 6,300,000 gallons of oil a day. The pipeline routes past several state parks and beaches, including Refugio State Beach, carrying crude from offshore platforms inland and to refineries.

22.     When Line 901 ruptured on the morning of May 19, 2015, it spilled toxic crude oil onto the beach and into the Pacific Ocean near Refugio State Beach.

23.     The smell of oil pouring out of the ruptured pipe overwhelmed neighbors and beachgoers.  At approximately11:30 a.m. the Santa Barbara County Fire Department responded to reports of the odors, and arrived to find oil flowing from the pipeline, through a storm drain under Highway 101, onto and across the beach, and into the Pacific Ocean.  The oil then began to spread along the shoreline, and washed up on nearby properties.  Oil continued to leak from the pipeline throughout the afternoon.

24.     After the oil covered the beach and rocks just below the failed pipe, it reached the water and spread quickly, travelling for miles out to sea.  It polluted and fouled beaches for miles around.  As of June 8, 2015, the spill had impacted up to 50 miles of shoreline along the Central Coast.  By June 22, 2015, Defendants confirmed that their oil has washed up in identifiable tarballs on Manhattan Beach, 130 miles south of Santa Barbara.  It is presently unknown how far north the oil spill has traveled.

25.     The precise timeline of events is still not clear, but it appears that Defendants failed promptly act to respond to signs of the pipeline failure or to notify relevant government agencies. According to a letter from California's two United States senators, there was serious concern that "Plains Pipeline may not have detected this spill or reported it to federal officials as quickly as possible, and that these delays could have exacerbated the extent of the damage to the environment." The senators called Defendants' response "insufficient."

26.     According to many witnesses who visited Refugio State Beach the night of the spill as well as nearby homeowners, there was little or no initial response.  Even the next day, as professional clean-up crews began to respond to Refugio State Beach, the response at other nearby

beaches was left to volunteers with little or no training or protective equipment, using nothing but shovels and five-gallon buckets to try to remove thousands of gallons of crude from the sand and sea.

27.     Despite the efforts of those volunteers and professional responders, the scope of the spill continues to expand.  It has already stretched far south of Santa Barbara, invaded the shoreline and beachfront properties, and impacted numerous Marine Protected Areas that provide vital breeding and feeding grounds for marine species.

28.     Tar balls are washing up on beaches far to the south and east of and the spill site, and oil sheen has stretched for miles.  Frisbee-sized "oil pancakes" are drifting toward Channel Islands National Park.  Many fish, birds, and marine mammals have died after being covered in oil or exposed to its toxic compounds. Those are the visible harms, relatively easy to see and tally.  Unseen as the oil sinks and swirls in the tides and currents is the affect on sea grass, kelp beds, reefs, and the aquatic food chain.  There are new reports of dead marine life appearing on area beaches nearly every day.

29.     Along the coast, the environmental impacts of the spill translate to profound economic impacts, and greatly diminish the value of properties along the shore.  The oil from Defendants' failed pipeline has polluted properties and beaches with toxic oil, and immediately impacted the ability of property owners to use and enjoy their homes.

30.     The spill has prevented homeowners from enjoying their beachfront properties, and discouraged tourists from visiting businesses and renting vacation homes in Santa Barbara County, where tourism (along with agriculture and wine) accounts for roughly 15 percent of the workforce, or over 36,000 jobs.  Two popular state beaches— Refugio and El Capitan— were closed during one of the busiest holiday weekends of the year.  Refugio is expected to remain closed until at least July 9, 2015.

31.     The oil spill also presents a serious risk to human life.  The Santa Barbara County Health Department has recommended that residents avoid all areas affected by the spill, but a major highway runs through and adjacent to the spill area. Refugio Beach, just south of Plaintiff's property, is considered a "Hazmat area," the County said. The County warned that direct contact with oil,

inhalation of fumes, or ingestion of contaminated fish or shellfish can cause skin irritation, nausea, vomiting, and other illnesses.

32.     Long term, the impacts maybe as-yet-unknown, but they are no less certain. Even with the best spill response, toxic oil will remain in the environment for a long time, continuing to contaminate properties along the shore, and harm water, wildlife, and beaches.  Five years after the Deepwater Horizon oil spill in the Gulf of Mexico, officials assessing the damage to that ecosystem said "the environmental effects of this spill is likely to last for generations."  This spill will likewise cause long-lasting environmental and economic impacts.

**C.     Defendants' Long and Reckless Practice of Avoiding Installing Safety Equipment.**

33.     Defendants wantonly disregarded the health and safety of the people and environment by operating a pipeline it knew did not have proper safety systems in place.  While this spill is a disaster, it is not an accident.

34.     In 1987, when Defendants constructed Line 901, Santa Barbara County's Energy Division sought to ensure the pipeline was constructed properly by, among other things, inspecting the welds on the pipeline using x-rays. The Division routinely inspected welds on new pipelines, as a way to ensure they had been done correctly to reduce the risk of failure. The Division also ordered Defendants to install an automatic shut-off valve system on the pipeline to ensure the pipeline would shut down swiftly, and without having to wait for human action, at the first sign of a problem in the pipeline.

35.     But rather than agreeing to these commonplace and common-sense safety protocols, Defendants fought the County in federal court to avoid regulation over their pipeline design and installation.

36.     As a result, today Line 901 appears to be the only pipeline in Santa Barbara County that is preempted from monitoring and safety inspections.  Defendants and their employees rarely, if ever, attend monthly meetings conducted by Santa Barbara County to discuss safety concerns with all the pipeline operators in the County.

/ / /

09000.024 - 245828.2

37.     While Santa Barbara, its citizens, real property owners, and environment bore the risk of Defendants' conduct, Defendants reaped the rewards with an estimated market value of nearly $19 billion, and profits of approximately $389 million on over $2 billion in earnings.  By avoiding the cost of safety equipment and systems, Defendants boosted their profits and transferred the cost of failure to people who live, work, and own property in Santa Barbara County and along the Pacific Coast.

38.     Defendants' number of crude oil incidents as an operator is increasing faster than the national average.   Last year, for example, a poorly maintained pipeline owned and operated by Defendants ruptured in a Los Angeles neighborhood, covering the streets, cars, houses, and businesses in oil.  A few years ago, another poorly maintained Plains pipeline ruptured and sent oil into a drinking water reservoir for Los Angeles.  The lax safety standards at Line 901 are not isolated incidents for Defendants. Since 2006 Plains has been cited for more than 175 violations of safety requirements, which have caused nearly $24 million in property damage.  Eleven of those incidents were in California.  Plains is one of the top four most cited pipeline operators in the country.

39.     In 2010, pursuant to a Consent Decree filed by the U.S. EPA following numerous alleged violations of the Clean Water Act by Defendants in several states, Defendants represented that they would update their procedures such that the "[i]f there is an unexplained increase in delivery flow-rate with corresponding decrease in pressure –[Plains would] SHUTDOWN the affected line segment."

40.     As part of that settlement, Defendants paid a $3.25 million penalty for 10 spills between June 2004 and September 2007 which discharged a total of roughly 273,420 gallons of crude oil into navigable waters or adjoining shorelines in Texas, Louisiana, Oklahoma, and Kansas,

41.     Plains itself recently acknowledged in a disclosure report to the U.S. Securities and Exchange Commission that it has "experienced (*and likely will experience future*) releases of hydrocarbon products into the environment from our pipeline . . . operations" that "may reach surface water bodies." (Emphasis added).

42.     In short, Plains has an ugly "tradition" of operating pipelines that fail.  The communities through which it transports oil suffer the consequences.

09000.024 - 245828.2

43.     Yet, Defendants have profited and continue to profit from their failure to comply with local, state, and federal requirements and guidelines, and their decision not to repair and/or replace Line 901.

44.     Defendants knew of the extremely high risk of catastrophic damage inherent in transporting oil through a pipeline.  Despite that, Defendants took little or no action to prevent or protect Plaintiff and the Class.  Defendants actively avoided taking action to protect Plaintiff and the Class from apparent risks its Line 901 pipeline presented. Defendants demonstrated a callous and reckless disregard for private property, human life, health, and safety by operating Line 901 without proper safety equipment. That disregard for property, human life and safety at Line 901 is part of a pattern and practice that Defendants have demonstrated across the country. Defendants acted with such indifference to the consequences of their misconduct, with such recklessness, and as part of a well-established pattern, as to be willful, malicious, and oppressive, and in disregard of the rights of the Plaintiff, thereby meriting an award of punitive or exemplary damages against Defendants.

45.     This lawsuit therefore seeks to compensate Plaintiff and the members of the class – i.e., the victims of the spill and to ensure that Defendants are prevented from causing additional damage and injury to beachfront property owners and residents along the Central Coast in the future.

## VI. PLAINTIFF'S FACTS

**A.     Plaintiff Is An Owner of Ocean and Beachfront Real Property**

46.     Plaintiff Alexandra B. Geremia, as Trustee for the Alexandra Geremia Family Trust dated 8/5/1998 is, a resident of Santa Barbara County.  The Alexandra Geremia Family Trust is the record owner of ocean and beachfront real property just north of Refugio State Beach.

47.     Ms. Geremia's home has immediate beachfront access to the ocean, including swimming, surfing, fishing, and kayaking directly from the property.  Before Defendants' oil spill, Ms. Geremia was able to enjoy the pristine natural environment in the area of her home, and the value of her home reflected its shoreline location, direct access to the ocean, the waves lapping at the shore and clean air brought by ocean breezes.

48.     Then Defendants spilled over 100,000 gallons of crude oil, which poured into the Pacific Ocean and onto public and private coastal properties, including Ms. Geremia's beachfront

property.  Since the spill, her property has been bombarded with a steady stream of oil tarballs and oil sheen from the spill, and she has been unable to even walk on the beach.  The clean-up efforts near her home have been unsatisfactory, and long-term contamination of her property is likely.  The consequences of the oil spill have had and will continue to have a devastating effect on value of the property, and her ability to rent it or sell it has evaporated.

49.     Ms. Geremia believes the negative consequences of Defendants' oil spill will continue to depress the value of her property for the remainder of the year and for years to come. Defendants' acts and omissions have therefore caused present injury to Ms. Geremia, as well as the concrete risk of imminent, additional injury.

## VII. CLASS ACTION ALLEGATIONS

50.     Plaintiff brings claims pursuant to Federal Rule of Civil Procedure 23 on behalf of the class of similarly situated persons. Plaintiff proposes to represent the following class:

> All owners of oceanfront and/or beachfront real property and long-term lessees of oceanfront and/or beachfront real property on the Pacific Coast of California, from Point Concepcion to the southern border of San Diego County, who claim injury or damage to real property as a result of Defendants' May 19, 2015 oil spill from Line 901.

51.     The class members are ascertainable and have a well-defined community of interest among their members.

52.     The following persons and counsel are proposed as representatives for the Class:

(a) The proposed representative plaintiff for the Class is:  Alexandra B. Geremia, as Trustee for the Alexandra Geremia Family Trust dated 8/5/1998.

(b) The proposed counsel for the Class is: A. Barry Cappello, Leila J. Noel and Lawrence J. Conlan of Cappello & Noel LLP.

53.     Excluded from the Class are:

(a) the officers and directors of any of Defendants;

(b) any judge or judicial officer assigned to this matter and his or her immediate family and staff; and

(c) any legal representative, successor, or assign of any excluded persons or entities.

09000.024 - 245828.2

54.     Plaintiff's claims are made on behalf of herself and all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure.

**A.     Numerosity of the Class**

55.     On information and belief, the Class consists of between approximately 3,000 – 25,000 individuals and/or entities from a defined geographical area which own oceanfront and/or beachfront real property or are long term lessees of oceanfront and/or beachfront real properties and have been legally injured by the disaster, making joinder impracticable.  Class members can be informed of the pendency of this action by published, internet, and broadcast notice.

**B.     Typicality and Commonality of the Class.**

56.     The claims of the representative Plaintiff are typical of the claims of the Class in that the representative Plaintiff, like all Class members, has suffered adverse effects proximately caused by the disaster.

57.     Furthermore, the factual bases of Defendants' misconduct are common to all Class members and represent a common thread of misconduct resulting in injury to all members of the Class.

**C.     Adequacy of Representation.**

58.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting environmental, mass tort, and complex class actions, including actions involving environmental contamination and, catastrophic oil spills. The undersigned counsel for Plaintiff has experience in complex class action litigation and trials, including environmental contamination, race discrimination under California's Unruh Act, the Santa Barbara oil spill of 1969 which led to the birth of the environmental movement, and expertise on punitive damages issues. Plaintiff and her counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor her counsel has interests adverse to those of the Class.

**D.     Predominance of Common Questions of Fact and Law**

59.     There is a well-defined community of interest in that the questions of law and fact common to the Class predominate over questions affecting only individual Class members and

include, but are not limited to, the following:

a) Whether Defendants acted negligently, intentionally, fraudulently and/or illegally to cause the spill;

b) Whether Defendants had installed and maintained adequate safety measures and systems on Line 901 and in its systems of command and control to prevent the spill;

c) Whether Defendants conducted adequate supervision that could have prevented the spill;

d) Whether Defendants engaged in unconscionable, deceptive, and/or unreasonable business practices and conduct;

e) Whether Defendants knowingly, intentionally, or negligently concealed, suppressed, or omitted material facts concerning the safety of its pipeline from the public and/or regulatory agencies;

f) Whether Defendants knowingly, intentionally, or negligently concealed, suppressed, omitted, or delayed relaying material facts regarding the spill to local, state, and federal agencies, thereby slowing the response, and/or increasing the damages to Plaintiff and members of the Class;

g) Whether the Class suffered injury by virtue of Defendants' negligence, recklessness, carelessness, and/or unconscionable and/or deceptive business practices; and

h) Whether Defendants are strictly liable to Plaintiff and the Class, by virtue of State and/or Federal Law.

**E.      Superiority**

60.      Absent class treatment, Plaintiff and Class members will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.

61.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Without a class action, individual Class members would face burdensome litigation expenses, deterring them from bringing suit or adequately protecting their rights. Because of the ratio of the economic value of the individual Class members' claims in comparison to the high litigation costs in complex cases such as this, few could likely seek their

1  rightful legal recourse.  Absent a class action, Class members would continue to incur harm without

2  remedy.

3          62.      The consideration of common questions of fact and law will conserve judicial

4  resources and promote a fair and consistent resolution of these claims,

5          63.      **Rule 23(b)(3)**: In addition to satisfying the prerequisites of Rule 23(a), Plaintiff

6  satisfies the requirements for maintaining a class action under Rule 23(b)(3). Common questions of

7  law and fact predominate over any questions affecting only individual class members and a class

8  action is superior to individual litigation.  The amount of damages available to an individual plaintiff

9  is insufficient to make litigation addressing Defendants' conduct economically feasible in the

10  absence of the class action procedure. Individualized litigation also presents a potential for

11  inconsistent or contradictory judgments, and increases the delay and expense to all parties and the

12  court system presented by the legal and factual issues of the case.  By contrast, the class action

13  device presents far fewer management difficulties and provides the benefits of a single adjudication,

14  economy of scale, and comprehensive supervision by a single court.

15          64.      **Rule 23(b)(2)**. Plaintiff also satisfies the requirements for maintaining a class action

16  under Rule 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the

17  proposed class, making final declaratory or injunctive relief appropriate with respect to the proposed

18  class as a whole.

19          65.      **Rule 23(c)(4).** Plaintiff also satisfies the requirements for maintaining a class action

20  under Rule 23(c)(4). The claims of class members are composed of particular issues that are

21  common to all class members and capable of class wide resolution that will significantly advance the

22  litigation.

### VIII. CAUSES OF ACTION

### <u>First Claim for Relief</u>

**Strict Liability under Lempert-Keene-Seastrand Oil Spill Prevention and
Response Act, Government Code Section 8670, *et seq*.**

          66.      Plaintiff incorporates by reference each and every prior and subsequent allegation of

this Complaint as if fully restated here.

67.     The Lempert-Keene-Seastrand Oil Spill Prevention and Response Act provides that "[a] responsible party, as defined in Section 8670.3, shall be absolutely liable without regard to fault for any damages incurred by any injured party that arise out of, or are caused by, a spill."  Cal. Gov. Code Section 8670.56.5(a).

68.     The Pacific Ocean and the waters off California's Central Coast are "state waters" as defined in Section 8670.3(ag).

69.     Defendants are "responsible part[ies]," as defined in Section 8670.3(w) which includes "the owner or transporter of oil or a person or entity accepting responsibility for the oil."

70.     The oil transported through Line 901 is "oil" within the meaning of the Act, which defines "oil" as "any kind of petroleum, liquid hydrocarbon, or petroleum products or any fraction or residues there from," including "crude oil."

71.     As the responsible party for the oil transported through Line 901, Defendants are absolutely liable under the Lempert-Keene-Seastrand Act.

72.     On May 19, 2015, Defendants discharged or leaked crude oil into the Pacific Ocean and onto Plaintiff's property, and is therefore absolutely liable without regard to fault for all damages that Plaintiff and Class sustained or will sustain.  That discharge was not permitted by state or federal law.

73.     The Act entitles a plaintiff to recover a wide variety of damages, including, but not limited to, injury to, or economic losses resulting from destruction of or injury to, real or personal property, which shall be recoverable by any claimant who has an ownership or leasehold interest in property; loss of taxes, royalties, rents, or net profit shares caused by the injury, destruction, loss, or impairment of use of real property, personal property, or natural resources; loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, and loss of subsistence use of natural resources; response, containment, cleanup, removal, and treatment, including monitoring and administration costs.  *See generally* Cal. Gov. Code Section 8670.56.5(h).

/ / /

74.     The contamination illegally caused by the discharge of crude oil from Line 901 into the Pacific Ocean and onto coastal properties and beaches injured, caused to be lost, and/or impaired the value, use and enjoyment of real property owned by Plaintiff and the Class.

75.     The injury, destruction, loss, and/or impairment of usability to and of real property has caused Plaintiff and the Class to suffer diminution of property value and loss of enjoyment of property in the short and long term, and will cause future losses and/or profits, including but not limited to loss of property value, and loss of profits from the sale and/or rental of such property.

76.     The long-lasting effects of the contamination of the discharge of toxic crude oil into the Pacific Ocean on marine life and onto the real property that Plaintiff and the Class own or lease, requires that Plaintiff and the Class continue future monitoring and testing activities in order to ensure such marine life, beaches and property are not contaminated and are safe and fit for human use and consumption, and to ensure that the toxic oil from the spill does not further contaminate and degrade their real property.

## **Second Claim for Relief**

### **Violation of the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.**

77.     Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

78.     The Federal Oil Pollution Act provides that "each responsible party for…a facility from which oil is discharged…into or upon the navigable waters or adjoining shorelines…is liable for the removal costs and damages…that result from such incident."  33 U.S.C. § 2702(a).

79.     Recoverable damages include "injury to, or economic losses resulting from destruction of, real or personal property" and "the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources."  *Id*. at (b)(2)(B) & (E).

80.     The Act defines "facility" as including a "pipeline" used for transporting oil. 33 U.S.C. § 2701(9).

81.     In the case of a discharge of oil from a pipeline, the "responsible party" is "any person owning or operating the pipeline." *Id.* at (32)(E).

82.     Defendants are the owners and/or operators of Line 901, and are thus the "responsible party."

83.     Line 901 is a "facility" as it a pipeline that transports oil.

84.     Plaintiff and members of the Class have suffered and will continue to suffer damage to real property, economic losses, and impairment of their use and enjoyment of real property as a result of the discharge of oil from Defendant's pipeline.

85.     Defendant is responsible for compensating Plaintiff and members of the Class for their current and future harm and damage, removing the oil from their real property and the surrounding environment, restoring the properties and natural resources harmed and/or destroyed as a result of Defendants' oil spill, and ensuring that oil is not moved through the pipeline and near neighboring properties without adequate safety mechanisms to prevent future spills and regular monitoring.

### Third Claim for Relief

### Trespass

86.     Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

87.     Defendants discharged a polluting matter beyond the boundary of Plaintiff's and Class Members' real property in such a manner that, it was reasonably foreseeable that the pollutant would, in due course, invade Plaintiff's and Class members' real property and cause harm.

88.     By discharging polluting matter, Defendants entered, invaded, and intruded on the real properties of Plaintiff and the Class members' without privilege, permission, invitation, or justification.

89.     Defendants had a duty to use reasonable care not to enter, intrude on, or invade Plaintiff's and Class members' real properties.  Defendants also owed a duty to Plaintiff and members of the Class to exercise reasonable care in the manufacture, maintenance, and operation of Line 901.

/ / /

90.     Defendants had a heightened duty of care to Plaintiff and the Class because of the great danger associated with transporting oil so near to pristine coastal residential areas and nearby real properties along the Central Coast.

91.     Defendants breached the duty they owed to Plaintiff and members of the Class when they failed to exercise reasonable care in the manufacture, maintenance, and operation of Line 901, which conduct resulted in entry, intrusion, or invasion on Plaintiff's and Class Members' real properties.

92.     Defendants knew or should have known that their conduct would foreseeably result in a disastrous oil spill, causing damage to the real properties and economic interests of persons in the area affected by the spill.

93.     As a direct and proximate result of Defendants' trespass, Plaintiff and Class Members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate, loss of income and other economic loss.

94.     Defendants' wanton or reckless conduct, as described herein, entitles Plaintiff and Class members to punitive damages.

## Fourth Claim for Relief

### Strict Liability for Ultrahazardous Activities

95.     Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

96.     At all times herein, Defendants are the owners and operators of the oil pipeline known as Line 901.

97.     At all times relevant to this action, Defendants had supervision, custody, and control of Line 901.

98.     At all times herein, Defendants were under a continuing duty to protect Plaintiff and the Class from the harm caused by Line 901.

99.     Defendants were engaged in an ultrahazardous activity by transporting flammable, hazardous, and toxic oil through its pipeline.

100.    Plaintiff and the Class have suffered harm from the discharge of toxic oil from Defendants' Line 901.

101.    The injuries sustained by Plaintiff as a result of the oil spill were the direct and proximate result of Defendants' activity.

102.    The harm to Plaintiff and the Class, was of the kind of harm that would reasonably be anticipated as a result of the risks created by transporting flammable, hazardous, and toxic oil in a pipeline in close proximity to nearby real properties and the Pacific Ocean.

103.    Defendants' operation of Line 901 and its failure was a substantial factor in causing the harms suffered by Plaintiff and the Class.

104.    Due to Defendants' strict liability, Plaintiff and Class members are entitled to recover actual damages.

105.    The acts and omissions of Defendants were done with malice, fraud, and/or oppression as set out in this Complaint.

### Fifth Claim for Relief

### Negligence

106.    Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

107.    Defendants owed a duty to Plaintiff and the Class to exercise reasonable and ordinary care.  That duty arose from, among other things, federal, state, and local laws that require Defendants to operate a pipeline in a manner that does not damage public health and safety.

108.    Defendants breached that duty to Plaintiff and the Class by, among other things, failing to install reasonable safety equipment to prevent a spill, and failing to promptly respond to and contain the spill.

109.    Defendants, in the exercise of reasonable care, should have known that Line 901 could rupture or otherwise fail, and spill significant amounts of oil.  Defendant has acknowledged that spills such as this have occurred on its pipelines in the past and will occur again.

110.    As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have sustained damages.  Those damages take primarily two forms: short-term and long-term.

111.     The short-term damages include loss of use of real property for enjoyment and recreation due to the contamination of such property by toxic crude oil spilled from Defendants' pipeline, as well as potential lost rental income and profits from vacationers and tourists visiting Santa Barbara.

112.     The long-term damages include future diminution and loss of real property sale and rental value due to the harm caused to the properties themselves and long-term contamination from toxic crude oil.

113.     Finally, the taboo associated with an oil spill has and will continue to drive down business and property values.

114.     Similarly, the image of the Central Coast as a pristine place and as a perfect place to live and vacation has been tarnished.  Local beaches and waters are now fouled and will dissuade prospective home buyers and people from visiting the region and the many businesses and property owners who depend on tourism and other visitors.

**Sixth Claim for Relief**

**Negligence Per Se**

115.     Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

116.     At all times herein mentioned, Defendants negligently, wantonly, carelessly and/or recklessly maintained and operated Line 901.

117.     Defendants violated several statutes, ordinances, or regulations including but not limited to the Lempert-Keene Act, Government Code Section 8670, *et seq*., and the Porter-Cologne Act, Water Code Sections 13000, *et seq*., and Cal. Fish & Game Code Section 5650, *et seq*.

118.     As a direct and legal cause of the Defendants' wrongful acts and omissions herein above set forth, Plaintiff and the Class have suffered and will suffer economic harm, injury to property, and losses.

119.     Plaintiff's harm resulted from the occurrence of the nature that the laws listed above were designed to prevent, and Plaintiff is a member of the Class of persons for whose protection those laws were adopted.

120.     The acts and omissions of Defendants, and each of them, were done with malice, fraud, and/or oppression as described in this Complaint.

### Seventh Claim for Relief

### Public Nuisance

121.     Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

122.     Defendants have created a condition that is harmful to health and interferes with the comfortable enjoyment of life and property by discharging more than 100,000 gallons of crude oil onto the beaches of the Central Coast and into the Pacific Ocean.

123.     That nuisance affects a substantial number of individuals similarly situated to the Plaintiff, such as real property owners, residents and lessees of property on the California Coast, who rely on the safe and healthy environment of the area, and whose use and enjoyment of their real property has been interfered with by Defendants.

124.     The oil spill is a condition which would reasonably annoy and disturb an ordinary person, as shown by, for example, the health impacts warned of by the county, the community outrage in response to the spill, and the nationwide interest in the spill's impact on the California Coast.

125.     The seriousness and gravity of that harm outweighs the social utility of Defendants' conduct.  There is little or no social utility associated with releasing tens of thousands of gallons of oil into the unique ecological setting of the coastal areas near Santa Barbara.

126.     Plaintiff and the Class suffered substantial actual damage and injury to their real property value and economic livelihood, which they did not consent to and which is different from the type of harm suffered by the general public.

127.     The above acts and omissions also created a public nuisance *vis-à-vis* the Plaintiff and the Class, interfering with the real property rights of Plaintiff and the Class, and rights incidental to those property rights.

128.     The acts and omissions of Defendants described herein were also in violation of various California state laws including but not limited to the Lempert-Keene Act, Government Code

COMPLAINT – CLASS ACTION

1   Section 8670, *et seq*., and the Porter-Cologne Act, Water Code Sections 13000, *et seq*., and Cal. Fish

2   & Game Code Section 5650, *et seq*.

3       129.    Defendants' violations of those statutes directly and proximately caused, and will

4   cause, injury to the Plaintiff and the Class of a type which the statutes are intended to prevent.

5   Plaintiff and the Class are of the class of persons for whose protection these statutes were enacted.

6       130.    As a direct and legal cause of Defendants' wrongful acts and/or omissions herein

7   above set forth, Plaintiff and the Class have suffered and will suffer economic harm, injury to

8   property, and losses as herein above set forth.

9       131.    To remedy the harm caused by Defendants' nuisance, Plaintiff will seek public

10  injunctive relief, including, but not limited to, an order requiring Defendants to restore the area real

11  properties and beaches impacted by the spill, to repair short and long term damages to coastal

12  properties, to repair reputational damage done to coastal property values, and preventing Defendants

13  from operating Line 901 or other nearby pipelines without adequate safety mechanisms to prevent

14  future failures and spills and without ongoing monitoring to ensure that no future spills occur.

15      132.    In maintaining the nuisance, which is ongoing, Defendants are acting with full

16  knowledge of the consequences and damage being caused, and the acts and omissions of Defendants,

17  were done with malice, fraud, and/or oppression as described in this Complaint.

18                          **<u>Eighth Claim for Relief</u>**

19                          **Continuing Private Nuisance**

20      133.    Plaintiff incorporates by reference each and every prior and subsequent allegation of

21  this Complaint as if fully restated here.

22      134.    Defendants' actions and inactions caused, maintained, and/or permitted the

23  contamination alleged in this action by its negligence, intentional or otherwise, actionable acts,

24  and/or omissions.

25      135.    Defendants created the contamination at issue, which is harmful to both human health

26  and the environment and interferes with Plaintiff's comfortable use and enjoyment of the real

27  property in which she has a possessory interest.

28

09000.024 - 245828.2

136.     Defendants were, at all relevant times, in sufficient control of Line 901 to have known of the threatened release of oil and associated hydrocarbons and to have prevented the resulting contamination.  Defendants knew or should have known that their operation of the failed pipeline would have, and did, cause the contamination described herein.

137.     Despite knowledge and forewarning, Defendants failed to take reasonable steps to prevent the failure which resulted in the contamination at issue.

138.     Defendants failed to take reasonable steps to abate the contamination at issue, which continues to spread to previously uncontaminated areas.  The contamination is, however, abatable, and, therefore, it is continuing in nature.  This also confirms that Defendants have knowingly maintained the nuisance, i.e. the contamination at issue.

139.     Plaintiff did not consent to the ongoing damage to the use and enjoyment of her property as a result of Defendants' actions and inactions.

140.     After having a reasonable opportunity to do so, Defendants failed to take reasonable measures to properly abate the contamination described herein.

141.     As a direct and proximate cause, Defendants' acts and omissions have caused substantial actual damage and immediate and ongoing diminution of the value of Plaintiff's real property and the property of the Class.

142.     As a result, Plaintiff has and will continue to suffer damages, both economic and otherwise.

143.     The contamination described herein constitutes a nuisance within the meaning of Section 3479 of California Civil Code.

144.     Plaintiff is informed and believes, and on that basis alleges, that the contamination is continuing and abatable.

145.     As a proximate result of the nuisance, Plaintiff has and will continue to suffer damages.

/ / /

/ / /

/ / /

09000.024 - 245828.2

## Ninth Claim for Relief

### Nuisance Per Se

146.     Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

147.     The contamination constitutes a continuing nuisance within the meaning of California Water Code Section 13050(m), and Section 3479 of California Civil Code.

148.     Plaintiff is in the class of persons protected under these statutes from Defendants and its violations thereof due to the fact that Defendants have, at all times relevant, owned, operated, maintained, supervised and/or controlled Line 901.

149.     Defendants violated California Civil Code section 3479 and California Water Code Section 13050(m) by their failure to properly abate the contamination, and by allowing contamination to continue to spread.

150.     As a proximate result of the nuisance per se, Plaintiff has and will continue to suffer damages.

## Tenth Claim for Relief

### Permanent Injunction

151.     Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

152.     Beginning on or about May 19, 2015, and continuing to the present time, defendants, and each of them, wrongfully and unlawfully caused oil to spill out of Line 901, onto surrounding areas, into the Pacific Ocean, and onto coastal real properties.

153.     In the absence of an injunction, Defendants will continue to violate the rights of Plaintiff and the Class.  Defendants, and each of them, have refused and still refuse to refrain from their wrongful conduct.

154.     Defendants' wrongful conduct, unless and until enjoined and restrained by order of this court, will cause great and irreparable injury to Plaintiff and the Class.

155.     Plaintiff and the Class have no adequate remedy at law for the injuries that will result from failure of the Defendants to safely operate their pipeline and it could be impossible for Plaintiff

23

09000.024 - 245828.2

and the Class to determine the precise amount of damages they will suffer if Defendants' conduct is not restrained and Plaintiff is forced to institute a multiplicity of suits to obtain adequate compensation for injuries and harm to real property.

### Eleventh Claim for Relief

**Violations of California's Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200,** *et seq***.**

156.    Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

157.    Defendants have engaged and continue to engage in unfair competition in violation of the Act.

158.    Defendants' conduct constitutes "unfair" business practices within the meaning of the Act in that members of the public have been harmed as a result of Defendants' oil spill encroaching onto their real property.

159.    Defendants' conduct amounts to "unfair" business practices as the Act forbids all wrongful business activities in any context in which they appear. Moreover, as described above, Defendants' practices offend established public policies, are immoral, unethical, oppressive, and unscrupulous. The impact of Defendants' practices is in no way mitigated by any justifications, reason, or motives.  Defendants' conduct has no utility when compared to the harm done to Plaintiff and members of the Class.

160.    Defendants' conduct was "unlawful" because it violated laws including but not limited to the Lempert-Keene Act, Government Code Section 8670, et seq., and the Porter-Cologne Act, Water Code Sections 13000, et seq., Cal. Fish & Game Code Section 5650, et seq. and, the Oil Pollution Act, and the oil spill response plans required by federal, state, and local laws. Federal, state, and local officials have announced civil and criminal investigations into Defendants' conduct related to the spill, so it is reasonable to infer that Defendants may have violated other laws.

161.    As a direct and proximate result of Defendants' unfair  and unlawful methods of competition and unfair and deceptive acts or practices, Plaintiff and the Class have sustained harm and are entitled to restitution.

09000.024 - 245828.2

162.    As a proximate result of Defendants' unfair methods of competition and unfair and deceptive acts or practices, Defendants have been unjustly enriched and should be required to make restitution payments to Plaintiff and the Class pursuant to Bus. & Prof. Code § 17203 and should be enjoined from operating Line 901 or any other section of the pipeline without adequate safety mechanisms in place and regular monitoring to ensure the pipeline does not fail again.

163.    The acts and omissions of Defendants were done with malice, fraud, and/or oppression as described in this Complaint.

## **Request for Relief**

Plaintiff, individually and on behalf of all others similarly situated, requests judgment against Defendants as follows:

A.    For an order certifying the Class and appointing Plaintiff as a representative of the Class and appointing the lawyers and law firm representing Plaintiff as counsel for the Class;

B.    Permanently enjoining Defendants from operating a pipeline in Santa Barbara County without adequate safety and response measures and ongoing monitoring;

C.    For all recoverable compensatory, statutory, and other damages sustained by Plaintiff and the Class;

D.    For all equitable relief including disgorgement, unjust enrichment, and all other relief allowed under applicable law;

E.    Granting Plaintiff and the Class awards of restitution and/or disgorgement of Defendants' profits from its unfair and unlawful practices described above;

F.    For costs;

G.    For both pre-judgment and post-judgment interest on any amounts awarded;

H.    For appropriate injunctive relief, including public injunctive relief; *i.e.*, an order requiring Defendants to restore property values impacted by the spill and to repair reputational damage done to ocean and beachfront real property values along California's Central Coast;

I.    For treble damages insofar as they are allowed by applicable laws;

J.    For appropriate individual relief as request above;

COMPLAINT – CLASS ACTION

1    K.    For payment of attorneys' fees and expert fees as maybe allowable under applicable

2  law, including Cal. Gov. Code section 8670.56.5(f) and the Private Attorneys General Act

3  ("PAGA"), Cal. Code. Civ. P., §1021.5;

4    L.    For exemplary or punitive damages under Cal. Civ. Code section 3294 for the

5  oppression, fraud, and malice alleged above; and

6    M.    For such other and further relief, including declaratory relief, as the Court may deem

7  proper.

8  ## IX. DEMAND FOR JURY TRIAL

9    Plaintiff hereby demands a trial by jury on all issues so triable.

10

11  RESPECTFULLY SUBMITTED this 23rd day of June, 2015.

12

13    CAPPELLO & NOËL LLP

14    By:  */s/A. Barry Cappello*
       A. Barry Cappello (SBN 037835)
15     abccappellonoel.com
       Leila J. Noël (SBN 114307)
16     lnoel@cappellonoel.com
       Lawrence J. Conlan (SBN 221350)
17     lconlan@cappellonoel.com
       831 State Street
18     Santa Barbara, CA 93101
       Tel: (805) 564-2444
19     Fax: (805) 965-5950
20
21     Attorneys for Plaintiff
22
23
24
25
26
27
28

26
09000.024 - 245828.2